# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MORRIS LEE MESTER, | CASE NO. 1:04-cv-06580-LJO-SMS PC |
|         Plaintiff, | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED, AND RECOMMENDING DOCUMENTS 132-134 BE STRICKEN FROM THE RECORD |
|     v. | |
| DR. M. KIM, et al., | |
|         Defendants. | (Doc. 100) |
| | OBJECTIONS DUE WITHIN THIRTY DAYS |

I.    <u>Defendants' Motion for Summary Judgment</u>

    A.    <u>Procedural History</u>

Plaintiff Morris Lee Mester ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on plaintiff's complaint filed November 12, 2004, against defendants Nicholes, Neubarth, Sacks, Kim, Malfi, Robinson, and Plaza ("defendants") on plaintiff's claim that they violated the Eighth Amendment by acting with deliberate indifference to his serious medical needs from June 2003 to March 2004. (Docs. 1, 33.) On February 15, 2007, defendants filed a motion for summary

///
///
///
///
///

judgment. (Docs. 100, 101.) Plaintiff filed an opposition on April 19, 2007, and defendants filed a reply on June 6, 2007.[1,2] (Docs. 119, 129.)

### B. Legal Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

---

[1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on June 10, 2005. Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (Doc. 32.)

[2] Pursuant to the court's orders of April 16, 2007, and April 26, 2007, the opposition filed on April 6, 2007, and the reply filed on April 12, 2007, are superceded by the subsequent opposition and reply and are not considered. (Docs. 115, 116, 118, 122.)

material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

///

C. <u>Plaintiff's Claims for Violation of the Eighth Amendment</u>

Plaintiff is currently housed at Pleasant Valley State Prison (PVSP) in Coalinga, California, where the events giving rise to plaintiff's claims in this action allegedly occurred. At issue is whether or not defendants, all of whom worked at PVSP during the relevant time period, acted with deliberate indifference to plaintiff's serious medical needs, in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment.

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981). A prisoner's claim of inadequate medical care does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate indifference in doing so.'" <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting <u>Hallett v. Morgan</u>, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)). A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment," or in the manner "in which prison physicians provide medical care." <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992), <u>overruled on other grounds</u>, <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. <u>McGuckin</u>, 974 F.2d at 1060 (citing <u>Shapely v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985)).

        1. <u>Defendants Nicholes, Neubarth, Sacks, and Kim</u>

            a. <u>Plaintiff's Allegations</u>

In his complaint, plaintiff alleges that on June 23, 2003, he was diagnosed with an inguinal hernia in his left groin area and was referred for surgery by defendant Nicholes, a medical doctor. Plaintiff alleges that defendant Nicholes also "medically unassigned" him on July 31, 2003, due to hernia complications. (Doc. 1, Comp., Attach pg. 2.) Plaintiff alleges that he complained on a daily

1  basis about the abdominal pain from the hernia, and about the hernia's interference with his bowel
2  movements.
3        Plaintiff alleges that on December 10, 2003, he was suffering from hernia pain, and
4  abdominal pain and bloating due to his inability to defecate, and was rushed to the prison's
5  emergency room. Plaintiff alleges that abdominal x-rays revealed fecal build-up in his chest and
6  abdomen, and a complete intestinal blockage caused by the hernia. Plaintiff alleges that he was
7  transferred to Mercy Hospital, where his system was flushed out with laxatives and enemas, and a
8  CT scan and colonoscopy were performed. Plaintiff alleges that hernia surgery was not performed
9  at the hospital because prison officials had to order it. Plaintiff alleges that he was discharged from
10 Mercy Hospital on December 13, 2003, but on December 15, 2003, his abdomen was extended again
11 due to his inability to go to the bathroom. Plaintiff alleges he was sent to the emergency room for
12 laxatives and returned to his cell.
13       Plaintiff alleges that on December 10, 2003, and again on January 27, 2004, he sent letters
14 to defendant Sacks explaining he was suffering from the hernia and requesting surgery, but the
15 surgery was continually delayed. Plaintiff alleges that he filed an emergency appeal on October 20,
16 2003, and was examined by Dr. Gross at the first level of review. Plaintiff alleges that Dr. Gross
17 found the hernia could not be reduced and was causing plaintiff pain while urinating, defecating, and
18 walking, and Dr. Gross ordered an urgent hernia surgery referral. Plaintiff alleges that defendant
19 Sacks, who never examined plaintiff, issued a contradictory response at the second level of review
20 stating that plaintiff had a reducible hernia that was causing distress on and off, and plaintiff was
21 scheduled for surgery but the operating room at California State Prison-Corcoran (CSP-Corcoran)
22 was closed, which was beyond their control. Plaintiff alleges that his hernia was not reducible, that
23 he could have died from a bowel obstruction due to the hernia, that the surgery could have been
24 performed at Mercy Hospital or Coalinga Hospital due to the severity of plaintiff's condition, and
25 that the closure of the operating room at Corcoran was no excuse.
26       Plaintiff alleges that he wrote a letter to defendant Neubarth on January 13, 2004,
27 complaining of pain and bowel obstruction, and requesting surgery, to no avail.
28 ///

Plaintiff alleges that on January 19, 2004, at 9:00 a.m., he went to sick call for abdominal pain, stomach bloating, and an unmoving bowel. Plaintiff alleges that defendant Kim, a physician, refused to see him. Plaintiff went to complain to Sergeant Bradford, who called the clinic and was told defendant Kim said for plaintiff to wait outside to see her. Plaintiff alleges that he waited until 12:30 p.m. and when Sergeant Bradford again called the clinic, he was told that defendant Kim had gone out the back door. Sergeant Bradford then sent plaintiff to the prison's emergency room.

Plaintiff alleges that on January 21, 2004, at 9:00 a.m., he went to sick call for abdominal pain and an unmoving bowel. Plaintiff alleges that defendant Kim told him she was going to order an emergency x-ray of his abdomen and if the x-ray showed feces, she would send him to an outside hospital for emergency surgery. Plaintiff alleges that the x-rays taken that day showed feces. Plaintiff alleges that defendant Nicholes read the x-ray results and told plaintiff he was full of bowel gas, but plaintiff was returned to his cell despite reporting what defendant Kim had said about going to an outside hospital.

Plaintiff alleges that on January 26, 2004, his abdomen was extended, causing him pain, and his bowel was not moving. Plaintiff alleges that he was in severe pain and was sent to Coalinga Hospital by defendant Kim "to be cleaned out," but defendant Kim would not give permission for surgery to be performed. (Id., Attach. pg. 6.) Plaintiff alleges that defendant Kim told him defendant Sacks had to authorize the hernia surgery. Plaintiff alleges he was given enemas which did not work and returned back to the prison.

Plaintiff alleges that on January 28, 2004, at 9:00 a.m., defendant Kim refused to see him or treat him for a bloated abdomen and "bowels not going down" even though he had a pass per the order of defendant Sacks to have his bowel rechecked following an emergency room visit the night before. (Id., Attach. pg. 5.) Plaintiff alleges that after he approached Sergeant Kahn and Sergeant Kahn called the clinic, Nurse Bond said that defendant Kim did not want to see plaintiff and had left through the back door.

Plaintiff alleges that on February 5, 2004, he wrote a letter to defendant Kim explaining his suffering and asking for emergency surgery, which was ignored.

///

Plaintiff alleges that on February 9, 2004, at 9:00 a.m., he went to sick call with severe pain in the abdomen and hernia area. Plaintiff alleges that defendant Kim again refused to see him and Sergeant Bradford again had to send him to the emergency room after observing his condition.

Plaintiff alleges that on February 28, 2004, Dr. Davis made out an urgent referral for surgery and said he would talk to defendant Sacks, to no avail.

Plaintiff alleges that on February 15, 2004, defendant Nicholes refused to see or treat plaintiff for hernia pain at the medical clinic, and said it was the same old thing and for plaintiff to wait for surgery. Plaintiff alleges that the surgery was subsequently performed on March 9, 2004.

          b.        <u>Defendants' Motion</u>

Defendants Nicholes, Neubarth, Sacks, and Kim argue in their motion that they are entitled to summary adjudication on the claims against them because they did not act with deliberate indifference to plaintiff's medical needs and did not delay plaintiff's hernia surgery. Defendants also argue that the surgery was elective rather than urgent, and the delay did not cause plaintiff any further harm. In support of their motion, defendants offer their declarations and excerpts from plaintiff's medical record.

In June of 2003, plaintiff was examined by defendant Nicholes, a physician and surgeon, for a reducible inguinal hernia. (Doc. 106, Nicholes Dec., ¶4.) From that point on, plaintiff was treated by defendant Nicholes as well as other staff physicians for the inguinal hernia, and treatment included pain medications such as Tylenol and Toradol, laxatives, a hernia belt, and out-patient medical consultations, as well as various tests. (Nicholes Dec., ¶4; Doc. 103, Sacks Dec., ¶4.)

On January 21, 2004, defendant Nicholes examined plaintiff for complaints of abdominal pain and found plaintiff to suffer from a reducible hernia. (Nicholes Dec., ¶6.) Pursuant to plaintiff's requests, defendant Nicholes placed a request for "elective" hernia surgery, but the request was denied because plaintiff was already scheduled to have the surgery on January 29, 2004. (Nicholes Dec., ¶6; Sacks Dec., ¶7.) Plaintiff's scheduled surgery ended up being postponed until March 9, 2004, due to the temporary closure of the CSP-Corcoran operating room. (Nicholes Dec., ¶7; Sacks Dec., ¶9.)

///

7

Defendant Nicholes contends that plaintiff did not suffer any additional harm due to the four month delay from the initial request date of November 2003 to March 9, 2004. (Nicholes Dec., ¶8.) Defendant Nicholes contends that plaintiff received all reasonable and necessary care within the community standards as well as the California Department of Corrections and Rehabilitation (CDCR) policies and procedures, and denies causing any delay in plaintiff's hernia surgery. (Id., ¶8, 10.) Further, in defendant Nicholes' medical opinion, plaintiff did not suffer any medical condition, such as diverticulitis, as a result of his hernia, and there is no relationship between a hernia and diverticulitis.[3] (Id., ¶10.) Defendant contends that any letter written to him regarding hernia surgery would have been forwarded to plaintiff's treating physician. (Id., ¶9.)

Defendant Neubarth, also a physician and surgeon, examined plaintiff regarding complaints of seizures, and examined plaintiff one time for abdominal pain, on July 24, 2003. (Doc. 105, Neubarth Dec., ¶3.) Defendant Neubarth ordered an ultrasound to rule out cholecystitis, an inflammation of the gallbladder, and the results were normal. (Id.) Defendant Neubarth denies examining plaintiff regarding his requests for hernia surgery, and points out that there are no specific allegations against him in the complaint. (Id., ¶¶4, 5.) Defendant Neubarth denies causing any delay in plaintiff's hernia surgery, and in defendant Neubarth's medical opinion, plaintiff did not suffer any medical condition, such as diverticulitis, as a result of his hernia, and there is no relationship between a hernia and diverticulitis. (Id., ¶6.) Defendant Neubarth contends that any letter written to him regarding hernia surgery would have been forwarded to plaintiff's treating physician. (Id., ¶5.)

Defendants contend that Dr. Salazar initially requested elective hernia surgery for plaintiff on November 4, 2003, and defendant Sacks, who was the Chief Medical Officer and Health Care Manager at PVSP, initially approved plaintiff's elective hernia surgery on November 12, 2003. (Sacks Dec., ¶5.) Surgery was scheduled for January 29, 2004, and defendant Sacks approved plaintiff's hernia surgery at the first response appeal level on or about December 2003, and at the second response appeals level on or about January 2004. (Id., ¶¶5, 6.) On January 27, 2004,

---

[3] Diverticulitis is the rupture of a diverticuli of the colon, which causes infection of the tissue surrounding the colon. (Doc. 105, Neubarth Dec., ¶6.)

1  defendant Sacks approved by telephone an order for medication concerning plaintiff's complaint of
2  abdominal pain, which was not uncommon.  (Id., ¶8.)

3      Defendant Sacks contends that any letter written to him or to a staff physician regarding
4  hernia surgery would have been addressed the next day at the routine morning meeting held with all
5  yard physicians working that particular morning.  (Id., ¶10.)  Further, the letter would have been
6  addressed at plaintiff's next appointment with the physician to whom the letter was written.  (Id.)
7  Defendant Sacks denies intentionally delaying plaintiff's request for hernia surgery, and in defendant
8  Sacks' medical opinion, plaintiff received all reasonably and necessary care in accordance with
9  CDCR policies and procedures.  (Id., ¶11.)

10      Defendant Kim, a physician and surgeon, first examined plaintiff for his complaints of
11  abdominal pain and inguinal hernia on or about January 2004.  (Doc. 104, Kim Dec., ¶3.)  At that
12  time, plaintiff was already on the elective surgery list at CSP-Corcoran.  (Id.)  Defendant Kim
13  contends that because plaintiff's inguinal hernia was reducible and could be reduced manually, there
14  was no medical necessity to operate on it immediately.  (Id.)  Incarcerated or strangulated hernias
15  require emergency surgery, but plaintiff's hernia was in neither category.  (Id., ¶4.)  Plaintiff also
16  received a colonoscopy which showed normal results.  (Id.)  In defendant Kim's medical opinion,
17  plaintiff suffered from Irritable Bowel Syndrome, which caused his abdominal pain, constipation,
18  and other bowel discomfort.  (Id., ¶5.)  Plaintiff was prescribed laxatives and stool softeners for this
19  problem, but was noncompliant in taking these medications because he did not believe his problem
20  involved constipation.  (Id.)

21      On January 19, 2004, at approximately 9:00 a.m., plaintiff was at the Correctional Treatment
22  Center (CTC) emergency room, and was treated by Dr. Salazar at approximately 9:30 a.m.  (Id., ¶6.)
23  Defendant Kim has no recollection of seeing plaintiff on January 19, 2004, and medical records
24  reveal that plaintiff was seen by Dr. Salazar at the CTC on that date.  (Id.)  Defendant Kim denies
25  refusing to treat plaintiff on January 21, January 28, and February 9, 2004, and denies intentionally
26  causing any delay in plaintiff's hernia surgery.  (Id., ¶¶7-9.)  On January 21, 2004, defendant Kim
27  ordered an abdominal series x-ray, and plaintiff was examined by defendant Nicholes for
28  constipation.  (Id., ¶7.)  On January 28, 2004, defendant Kim prescribed Milk of Magnesia for

9

plaintiff's constipation. (Id., ¶8.) On February 9, 2004, defendant Kim prescribed Tylenol and requested a nephrology consult. (Id., ¶9.) In defendant Kim's medical opinion, plaintiff did not suffer from any medical condition, such as diverticulitis, as a result of his hernia, and there is no relationship between a hernia and diverticulitis. (Id., ¶11.) Defendant Kim contends that any letter written to her would have been addressed at plaintiff's next appointment. (Id., ¶12.)

The court finds that defendants have met their initial burden of informing the court of the basis for their motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact. The burden therefore shifts to plaintiff to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As stated above, in attempting to establish the existence of this factual dispute, plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). Plaintiff must do more than attack the credibility of defendants' evidence, see National Union Fire. Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983) ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert . . . judgment."), and arguments or contentions set forth in a responding brief do not constitute evidence, see Coverdell v. Dep't of Soc. & Health Servs., 834 F.2d 758, 762 (9th Cir. 1987) (recitation of unsworn facts not evidence).[4]

                    c.        Plaintiff's Opposition

Although defendants object to plaintiff's documentary evidence on the ground that the documents are not authenticated, the defect is easily curable and the court can discern no good faith basis for an argument that the documents are not true and correct copies of plaintiff's prison medical

---

[4] However, verified complaints and oppositions constitute opposing affidavits for purposes of the summary judgment rule. Johnson v. Meltzer, 134 F.3d 1393, 1399-1400 (9th Cir. 1998). The facts set forth in the verified complaint or opposition must be based on the plaintiff's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); Lew v. Kona Hosp., 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e).

records. For this reason, the court will consider plaintiff's medical records as evidence to the extent cited to by plaintiff in his opposition. However, plaintiff is not competent to interpret the meaning of medical records, and his layman's interpretation cannot be accepted.

Plaintiff disputes the contents of defendant Nicholes' declaration and contends that he suffered from abdominal pain and intestinal blockage, not from constipation, and that defendant Nicholes admitted plaintiff's hernia was incarcerated on July 31, 2003. (Doc. 119, Opp., 19:21-27; Exhibit C.) Plaintiff contends that the treatment prescribed by doctors consisting of laxatives, suppositories, Dulcolax, Milk of Magnesia, and Fleet did more harm than good because he had an intestinal blockage, and that his x-rays revealed a complete intestinal blockage and pancreatitis, caused by the delay in surgery. (Id., 20:3-20; Exhibits D, E.) Plaintiff disputes that his hernia was reducible by lying down, but argues that in any event, the pain was the same standing up or lying down and he could not be expected to lie down until his surgery occurred. (Id., 20:27-21:6.) Plaintiff contends that defendant Nicholes made a referral for surgery on June 23, 2003, and disputes that Dr. Salazar initially made a surgery referral on November 4, 2003. (Id., 21:11-22; Exhibit B.) Plaintiff alleges that despite defendant Nicholes' stated position, plaintiff suffered severe pain, intestinal blockage, pancreatitis, and bile leakage into his blood stream. (Id., 21:28-22:4; Exhibits D, U.) Plaintiff contends that as a result in the surgery delay, he suffers from neuropathy, splenic granuloma, diverticulosis, and a calcified nodule in his left lung. (Id., 22:12-19; Exhibits U, V.)

Plaintiff also takes issue with defendant Neubarth's declaration. Plaintiff contends that defendant Neubarth intentionally delayed his surgery and failed to take plaintiff seriously. Plaintiff contends that the ultrasound ordered by defendant Neubarth was not normal as it revealed his pancreas was partially obscured by bowel gas. Plaintiff asserts that he was later found to be suffering from fecal matter in his upper and lower body.

With respect to defendant Sacks, plaintiff contends he was not taken seriously and if the operating room was closed from January 10, 2004, through January 23, 2004, his surgery should have been scheduled for January 24, 2004. Plaintiff contends that he was not scheduled for surgery on January 24, 2004, because defendant Sacks was intentionally delaying and preventing the surgery. Plaintiff also contends that on January 10, 2004, defendant Sacks had knowledge of the operating

1 room closure and could have made alternate arrangements to accommodate plaintiff's surgery.
2 Plaintiff also contends that although defendant Sacks said he approved medication for plaintiff, the
3 treatment was grossly inadequate.
4     Finally, plaintiff takes issues with defendant Kim's declaration. In addition to reciting some
5 of the same arguments already documented, plaintiff again sets forth the events documented in his
6 complaint.

       d.     Court's Findings

8     "Deliberate indifference is a high legal standard." Toguchi, 391 F.3d at 1060. "Under this
9 standard, the prison official must not only 'be aware of the facts from which the inference could be
10 drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'"
11 Id. at 1057 (quoting Farmer, 511 U.S. at 837). "'If a prison official should have been aware of the
12 risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the
13 risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).
14 "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does
15 not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice
16 does not become a constitutional violation merely because the victim is a prisoner." Estelle v.
17 Gamble, 429 U.S. at 106; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995);
18 McGuckin v. Smith, 974 F.2d 1050, 1050 (9th Cir. 1992), overruled on other grounds, WMX Techs.,
19 Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Even gross negligence is insufficient
20 to establish deliberate indifference to serious medical needs. See Wood v. Housewright, 900 F.2d
21 1332, 1334 (9th Cir. 1990).
22     "A difference of opinion between a prisoner-patient and prison medical authorities regarding
23 treatment does not give rise to a s 1983 claim," Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.
24 1981) (internal citation omitted), and a difference of opinion between medical personnel regarding
25 treatment does not amount to deliberate indifference, Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.
26 1989). To raise a triable issue of fact, plaintiff must submit admissible evidence showing "that the
27 course of treatment the doctors chose was medically unacceptable under the circumstances . . . and
28 ///

. . . that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986) (internal citations omitted).

Although plaintiff argues he was diagnosed with an incarcerated hernia in June of 2003, the medical records cited to by plaintiff indicate that when standing, plaintiff's hernia "felt to be incarcerated," but spontaneously reduced when lying down. (Exhibit C, pg. 1.) The records do not specify a diagnosis of an incarcerated hernia or intestinal blockage, and plaintiff is not qualified to interpret the records as containing such a diagnosis. The first and second pages of Exhibit D do not contain a diagnosis of intestinal blockage or pancreatitis, despite plaintiff's argument to the contrary. Both records indicate that plaintiff was to be evaluated to rule out those problems. The third and fourth pages are records from June 28, 2006, and are irrelevant to plaintiff's claims in this action. Exhibit V is a medical record from January 8, 2007, and is also irrelevant. Exhibit B, dated June 23, 2003, states "refer to gen'l surgery." However, for reasons elaborated on in the paragraphs that follow, the existence of this record does not raise a triable issue of fact as to whether defendants acted with deliberate indifference to plaintiff's serious medical needs.

There is no support for plaintiff contention that defendant Neubarth's description of his August 2003 ultrasound report as normal is belied by the report. Plaintiff is not qualified to render an interpretation or tender an opinion as to the medical significance, if any, of bowel gas partially obscuring the pancreas during the ultrasound. (Exhibit X.) Further, the description of the abdominal ultrasound exam as "unremarkable" supports defendant Neubarth's medical interpretation of the results as normal. (Id.) Although plaintiff argues that defendant Neubarth intentionally delayed his surgery and failed to take plaintiff seriously, plaintiff has submitted no evidence of this, and although plaintiff again points to Exhibit D as evidence that he had a bowel obstruction, the records to not support plaintiff's position. Plaintiff was evaluated to rule out a bowel obstruction. The records do not state that plaintiff was diagnosed with a bowel obstruction.

Further, construing the evidence in the light most favorable to plaintiff, the fact that defendant Nicholes indicated in June of 2003, that plaintiff should be referred to general surgery or that Dr. Gross indicated on December 8, 2003, that plaintiff's surgery should be done in the near future is not evidence that defendants chose a medically unacceptable course of treatment in

conscious disregard to plaintiff's health. With respect to plaintiff's claim that defendant Kim refused to see him or treat him on January 19, 21, and 28, 2004, and February 9, 2004, defendants have submitted evidence that plaintiff received medical care and/or medications on those dates. Even if defendant Kim did refuse to see plaintiff personally on those dates, there is no evidence that in doing so, she acted with deliberate indifference or that plaintiff suffered any further harm.

Plaintiff contends that Dr. Davis told him hernias may cause obstructions or pinched bowels, and that Dr. Davis issued a referral for urgent surgery. (Doc. 119, pg. 8; Exhibit K.) While Dr. Davis informed plaintiff in writing on February 18, 2004, and February 25, 2004, that hernias may cause obstructions or pinched bowels, the records do not reflect a diagnosis of either by Dr. Davis. (Exhibit K.) Rather, Dr. Davis's statements appear informational in nature, prompted by plaintiff's questions or concerns. (Id.) Further, although Dr. Davis filled out an urgent request for surgery, on February 18, 2004 apparently, because plaintiff's hernia was "very difficult to reduce unless supine," plaintiff's surgery was already scheduled. (Id.) To the extent that Dr. Davis may have had a difference in opinion regarding the urgency of plaintiff's surgery, that difference of opinion does not raise a triable issue of fact.

In sum, defendants have submitted evidence that plaintiff was diagnosed with a reducible hernia and his surgery was elective. Defendants have also submitted evidence that plaintiff was provided with medical treatment for his complaints from June 2003 through March 9, 2004, that the delay in surgery did not cause any additional harm, and that plaintiff did not suffer any other medical complications as a result of the hernia. Plaintiff's lay opinion regarding his medical conditions, lay opinion that his need for surgery was urgent or an emergency, lay opinion that the surgery delay caused intestinal blockage, pancreatitis, bile in the bloodstream, and other issues, and lay opinion that the medical care he received was subpar and inadequate are not admissible evidence. The medical records cited to by plaintiff do not contain the diagnoses plaintiff's contends they do, and plaintiff may not offer his own interpretation of the medical significance or meaning of the records, his own opinion on what his diagnoses were or should have been, or his own opinion as to the appropriate course of treatment. Plaintiff's disagreements with the course of treatment prescribed, and even the possibly conflicting opinions of other physicians, are insufficient to defeat defendants'

motion for summary judgment. There is no admissible evidence that defendants chose a medically unacceptable course of treatment in conscious disregard to plaintiff's health, and defendants Nicholes, Neubarth, Sacks, and Kim are entitled to judgment as a matter of law on plaintiff's claims against them.

### 2. Defendant Malfi

Plaintiff alleges that he spoke with defendant Malfi, the Chief Deputy Warden, one day on the yard and told Malfi about his hernia causing an intestinal blockage. Plaintiff alleges that defendant Malfi told plaintiff to write him a letter, which he did on January 23, 2004, requesting emergency surgery. Plaintiff alleges that his sister also spoke with defendant Malfi and requested that plaintiff be taken to an outside hospital for surgery to repair his hernia, but defendant Malfi told her plaintiff was only a little constipated and could wait for surgery.

Defendant Malfi was the Chief Deputy Warden, and his duties did not include providing medical care or treatment to inmates. (Doc. 107, Malfi Dec., ¶¶1, 2.) Rather, defendant Malfi's duties involved the administrative operation of the prison. (Id., ¶2.) With respect to medical issues, defendant Malfi contends that he relied on the medical staff's assessments and recommendations, and his common practice when he received letters from inmates regarding medical issues was to pass them on to the medical department. (Id., ¶3.) Defendant Malfi contends he had no responsibility for supervising prison medical staff, and did not oversee the medical care, treatment, or medical appeal grievances of inmates, and defendant Malfi denies intentionally causing any delay in plaintiff's request for hernia surgery, or acting with deliberate indifference to plaintiff's medical needs. (Id., ¶¶5, 7.)

Plaintiff contends that defendant Malfi is responsible for the delay in his surgery because defendant had the ability to intervene but failed to do so. (Doc. 119, pg. 32.) Plaintiff also contends that he wrote defendant a letter as instructed, requesting that he be sent out for surgery, to no avail, and that defendant told plaintiff's sister that plaintiff could wait for surgery because he was only a little constipated. (Id.)

Plaintiff's disagreement with the assessment of his medical needs by prison staff and the scheduling of surgery does not support a claim for violation of the Eighth Amendment. Defendants

15

have submitted evidence that plaintiff's surgery was elective and that plaintiff suffered no harm from the delay in surgery. Plaintiff has not submitted any admissible evidence raising a dispute as to those facts. As a result, even if defendant Malfi knew plaintiff wanted surgery and could have intervened with medical staff but did not do so, defendant Malfi's failure to act did not constitute deliberate indifference to plaintiff's medical needs. Defendant Malfi is entitled to judgment as a matter of law on plaintiff's claim against him.

### 3. Defendant Robinson

Plaintiff alleges that on Saturday, January 17, 2004, he was in pain, his abdomen was extended from the hernia blockage, and his bowel was not moving. Plaintiff explained his condition to Sergeant McCoy, who called defendant Robinson, a medical technical assistant. Plaintiff alleges that defendant Robinson refused to see him and told Sergeant McCoy to tell him to come to the clinic on Monday. Plaintiff alleges that his condition worsened that night and he was rushed to the prison's emergency room, where he was given laxatives and pain medication, and returned to his cell.

As a medical technical assistant (MTA), defendant Robinson's duties involve performing procedures regulated by licensure and certification such as administering medication to inmate patients, taking vital signs, monitoring blood pressure and blood glucose levels, and collecting and documenting medical notes to patients' medical charts. (Doc. 108, Robinson Dec., ¶¶1, 3.) MTAs also perform other duties under the clinical direction of a registered nurse or physician. (Id., ¶3.) Defendant Robinson states that she has no recollection of refusing any medical care to plaintiff on January 17, 2004 and, in any event, would never do so because she has no authority to refuse services to inmate patients. (Id., ¶4.) Defendant points out that other than the January 17, 2004, allegation, plaintiff alleges no other specific complaint against her, and she denies ever knowingly or intentionally causing plaintiff any pain, suffering, or injury of any kind, or acting with deliberate indifference to plaintiff's medical needs. (Id., ¶¶5, 6.)

Plaintiff asserts that he has filed at least three complaints against defendant Robinson, and that she knew he had a serious medical needs but refused to provide him with medical care on January 17, 2004. (Doc. 119, pg. 25.)

16

1    Plaintiff has not submitted any admissible evidence supporting his conclusory claim that
2 defendant Robinson knew he had a serious medical need but disregarded an excessive risk to his
3 health on January 17, 2004, by refusing to see him.  Although a defendant's statements offered
4 against that defendant are admissions rather than hearsay, plaintiff may not attest to Officer McCoy's
5 telephone conversation with defendant Robinson, as Officer McCoy's statements are hearsay and
6 inadmissible.  Fed. R. Evid. 801.  Further, even if defendant Robinson declined to see plaintiff that
7 day, something further is needed to demonstrate that defendant Robinson possessed the requisite
8 state of mind, thereby raising a triable issue of fact regarding whether defendant acted with deliberate
9 indifference.  Defendant Robinson is entitled to judgment as a matter of law.

          4.        <u>Defendant Plaza</u>

11    Finally, plaintiff alleges that on January 22, 2004, he was in the pill line and complained of
12 hernia pain.  Plaintiff alleges he was bent over holding his side and stomach.  Plaintiff alleges that
13 defendant Plaza, an MTA, told him there was nothing she could do.  Plaintiff then approached
14 Sergeant Garza, who went to speak with defendant Plaza but reported back that defendant Plaza said
15 there was nothing she could do.

16    As an MTA, defendant Plaza's duties were limited to distributing medication, monitoring
17 blood glucose levels, and monitoring blood pressure of inmate patients.  (Doc. 109, Griffith Dec.,
18 ¶5.)  While in charge of the pill line, defendant Plaza had very specific duties, such as verifying
19 dosage against the prescription, checking the inmates' identification cards, documenting the names
20 of inmate patients who did not show up for their medications, and obtaining refusal of medications
21 forms for inmates who did not want them.  (<u>Id</u>., ¶5.)  Any inmate who wants to be seen for medical
22 issues not related to medication distribution is asked to complete a Health Care Services Request
23 form No. CDC 7362 and place it in a box for the Registered Nurse (RN) to process.  (<u>Id</u>., ¶7.)  The
24 RN, not the MTA, is responsible for triaging the inmates and arranging for them to be seen by a
25 medical doctor.  (<u>Id</u>.)  Further, any inmate patient who wishes to be seen by a physician after 5:00
26 p.m. must put in a request to go to the Correctional Treatment Center (CTC).  (<u>Id</u>., ¶8.)  Plaintiff
27 alleges that MTA Plaza refused to allow him to see a doctor at 5:45 p.m. on January 22, 2004.  (<u>Id</u>.,
28 ¶9.)  However, if plaintiff had wanted to see a physician at that time, he would have been required

to complete Form CDC 7362, get triaged by the RN in charge, and go to CTC to be seen by a physician. (Id.)

Plaintiff has submitted no evidence bringing into dispute defendant's position that her duties as an MTA in charge of the pill line were limited and did not involve triaging inmates for medical care, or that if plaintiff needed to see a doctor on January 22, 2004, he needed to have completed a form and placed it in the box for the registered nurse to process. Further, plaintiff has submitted no evidence that defendant Plaza interfered with that procedure or prevented plaintiff from utilizing that procedure.

Sergeant Garza's statements and Inmate Williams's attestation as to what plaintiff said to him, offered by plaintiff in support of his opposition, are hearsay and inadmissible. (Doc. 119, pgs. 26 & 37.) Defendant Plaza's statement to plaintiff that there was nothing she could do is consistent with the evidence that her duties were limited and that there was a specific procedure in place for inmates to utilize if they needed to see a doctor. Although plaintiff contends she should have helped him with the form or called a nurse, plaintiff does not dispute what defendant was doing at the time he complained or that there was a large volume of medication she was involved in distributing. (Doc. 119, pg. 26; Griffith Dec., ¶6.) There is simply no evidence to support plaintiff's claim that defendant Plaza, engaged in handing out medication to inmates at the time, knowingly disregarded an excessive risk to plaintiff's health or prevented him from following the proper procedure for obtaining medical care after 5:00 p.m. Defendant Plaza is entitled to judgment as a matter of law on plaintiff's claim against her.

II.     <u>Filings of June 15, 2007, June 25, 2007, and July 2, 2007</u>

On June 15, 2007, plaintiff filed a document setting forth why he believes the hernia surgery conducted on March 9, 2004, was not successful. (Doc. 132.) On June 25, 2007, plaintiff filed a document regarding his current medical condition and retaliatory actions being taken against him. (Doc. 133.) Finally, on July 2, 2007, plaintiff filed a declaration stating that he has learned of various medical conditions caused by the intestinal blockage caused by the hernia. (Doc. 134.)

As plaintiff has been told repeatedly, the claims in this action are limited to the actions of the named defendants from June 2003 through March 2004. (See Doc. 124.) Plaintiff's current medical

condition is not at issue. The three filings submitted by plaintiff are not relevant to this action, and plaintiff's attestation that his hernia caused an intestinal blockage which caused other problems is not admissible, either in relation to defendants' motion for summary judgment or to support a new and different claim. The filings are in direct contravention of the court's order of May 9, 2007, and should be stricken from the record on that ground. (Doc. 124.)

III.     Conclusion and Recommendation

For the foregoing reasons, the court finds that plaintiff has not submitted admissible evidence raising any triable issues of fact, and defendants are entitled to judgment as a matter of law on plaintiff's Eighth Amendment medical care claims. Further, plaintiff's filings of June 15, 2007, June 25, 2007, and July 2, 2007, should be stricken pursuant to the court's order of May 9, 2007, as they are not relevant to the claims in this action.

Accordingly, the court HEREBY RECOMMENDS that:

1.    Defendants' motion for summary judgment, filed February 15, 2007, be GRANTED, thus concluding this action in its entirety; and

2.    Plaintiff's filings of June 15, 2007, June 25, 2007, and July 2, 2007, be STRICKEN from the record.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:     July 13, 2007**                                          /s/ Sandra M. Snyder
                                                                                  UNITED STATES MAGISTRATE JUDGE